**Exhibit 4 of Complaint**

## GRANT OF DEVELOPMENT RIGHTS, CONSERVATION RESTRICTIONS, OPTION TO PURCHASE, and RIGHT OF ENFORCEMENT OF THE UNITED STATES

KNOW ALL PERSONS BY THESE PRESENTS that **PHILIP PARENT** and **SUZANNE PARENT** of Sheldon, Franklin County, State of Vermont, on behalf of themselves and their heirs, executors, administrators and assigns (collectively "Grantor"), pursuant to Title 10 V.S.A. Chapters 34 and 155 and in consideration of the payment of Ten Dollars and other valuable consideration paid to Grantor's full satisfaction, does freely give, grant, sell, convey, and confirm unto the **VERMONT LAND TRUST, INC.**, a non-profit corporation organized under the laws of the State of Vermont, with its principal offices in Montpelier, Vermont, and qualified under Sections 501(c)(3) and 170(h) of the Internal Revenue Code ("VLT"), and the **VERMONT HOUSING AND CONSERVATION BOARD**, a public instrumentality of the State of Vermont with its office in Montpelier, Vermont ("VHCB"), and their respective successors and assigns (hereinafter collectively "Grantees") as tenants in common, forever, the development rights, option to purchase at agricultural value, access easement, and a perpetual conservation easement and restrictions (hereinafter known as the "Grant") in certain lands consisting of 279 acres, more or less, with the buildings and improvements now or hereafter situated thereon (hereinafter "Protected Property") located in the Town of Sheldon, Franklin County, State of Vermont, said Protected Property being more particularly described in Schedule A attached hereto and incorporated herein.  Grantor also gives, grants, sells, conveys and confirms a right of enforcement unto the UNITED STATES OF AMERICA, acting by and through the United States Department of Agriculture ("USDA") Natural Resources Conservation Service ("NRCS" or "UNITED STATES") on behalf of the Commodity Credit Corporation, as its interest appears herein.

The Agricultural Conservation Easement Program ("ACEP"), 16 U.S.C. 3865 et seq., and 7 CFR 1468 et seq. facilitated and provided funding for the purchase of this Grant, an agricultural land easement under ACEP, on the Protected Property for the purpose of protecting the agricultural use and future viability, and related conservation values of the Protected Property, by limiting nonagricultural uses and conservation values of the Protected Property.

The development rights hereby conveyed to Grantees shall include all development rights except those specifically reserved by Grantor herein and those reasonably required to carry out the permitted uses of the Protected Property as herein described.  The development rights and option hereby conveyed are rights and interests in real property pursuant to Title 10 V.S.A. §§ 823 and 6303.  The conservation restrictions hereby conveyed to Grantees consist of covenants on the part of Grantor to do or refrain from doing, severally and collectively, the various acts set forth below, to the extent those acts relate to Grantor and not exclusively to Grantees.  Grantor and Grantees acknowledge that the conservation restrictions constitute a servitude upon the land and run with the land.  The Grantor and Grantees and their respective heirs, successors, agents, assigns, lessees, and any other person claiming under them shall comply with all terms, conditions and restrictions of this Grant.

I. **Purposes of the Grant & Highly Erodible Land Conservation Plan**

   A. Purposes of the Grant

   1. Consistent with the goals set forth in 10 V.S.A. §§ 821 and 6301, the Grantor, Grantees and the United States acknowledge that this Grant is acquired with its primary purpose being to protect in perpetuity the agricultural use and future viability of the Protected Property. The primary purpose includes the purpose of promoting the sustainable management of soil resources in order to facilitate active and economically viable farm use of the Protected Property now and in the future.

   2. Grantor, Grantees and the United States acknowledge the following secondary purposes: to conserve scenic, open space, wildlife habitat, and other natural resources associated with the Protected Property; to improve the quality of life for Vermonters; and, to maintain for the benefit of future generations the essential characteristics of the Vermont countryside.  Natural resource conservation includes, but is not limited to, landform and vegetation changes that may accommodate riparian, floodplain and wetland functions, and therefore protects natural flowages and stream equilibrium conditions.

   3. The purpose of ensuring that working and productive agricultural lands remain available for production agriculture, affordable and owned by individuals actively engaged in farming will be further advanced by the Option to Purchase at Agricultural Value, as incorporated below.

   4. These purposes will be advanced by conserving the Protected Property because it possesses the following attributes:

      a) 53 acres of agricultural soils of prime significance which are 19% of the Protected

        Property;
- b) 87 acres of agricultural soils of statewide significance which are 30% of the Protected Property;
- c) 95 acres of managed forest;
- d) 5,275 feet of frontage on Colton Road and VT State Route 105, public highways with scenic vistas;
- e) bisected by 3,200 feet of the Missisquoi Valley Rail Trail, a public recreational trail with scenic vistas of the Protected Property
- f) in the vicinity of 5 other properties previously protected by Grantees;
- g) 3,900 feet of frontage on the Missisquoi River; and,
- h) wetlands and wildlife habitat.

Grantor and Grantees recognize these agricultural, silvicultural, scenic, ecological, and natural resource values of the Protected Property, and share the common purpose of conserving these values by the conveyance of conservation restrictions, development rights, and option to purchase, to prevent the use, fragmentation, or development of the Protected Property for any purpose or in any manner which would conflict with the maintenance of these values. Grantor and Grantees also recognize that the objectives of ensuring that working and productive agricultural lands remain available for production agriculture, affordable and owned by persons actively engaged in farming will be further advanced by the Option to Purchase at Agricultural Value, as incorporated below. Grantees accept such conservation restrictions, development rights and option to purchase in order to conserve these values for present and future generations and to ensure resale of the Protected Property at its agricultural value.

The purposes set forth above in this Section I are hereinafter collectively referred to as "Purposes of this Grant."

  B.  Highly Erodible Land Conservation Plan

    1.  As required by 7 CFR Part 12, the Grantor shall conduct all agricultural operations on the Protected Property in a manner consistent with a conservation plan for highly erodible land (known herein as the "HEL Conservation Plan") prepared by NRCS in consultation with the Grantor and Grantees. The HEL Conservation Plan shall be developed using the standards and specifications of the NRCS Field Office Technical Guide and 7 CFR Part 12 pertaining to all highly erodible land. NRCS shall have the right to enter upon the Protected Property, with advance notice to the Grantor and Grantees, in order to monitor compliance with the HEL Conservation Plan.

    2.  In the event of non-compliance with the HEL Conservation Plan, NRCS shall work with the Grantor to explore methods of compliance and give the Grantor a reasonable amount of time, not to exceed twelve months, to take corrective action. If the Grantor does not comply with the HEL Conservation Plan, NRCS will inform Grantees of the Grantor's non-compliance. Grantees shall take all reasonable steps to secure compliance with the HEL Conservation Plan following written notification from NRCS that (a) there is a substantial, ongoing event or circumstance of non-compliance with the HEL Conservation Plan; (b) NRCS has worked with the Grantor to correct such non-compliance; and, (c) Grantor has exhausted their appeal rights under applicable NRCS regulations. Grantor shall be liable for any costs incurred by NRCS its successors or assigns as a result of Grantor's negligence and/or failure to comply with the requirements of this Grant as it relates to the HEL Conservation Plan referenced herein.

    3.  If the NRCS standards and specifications for highly erodible land are revised after the date of this Grant based on an Act of Congress, NRCS will work cooperatively with the Grantor to develop and implement a revised HEL Conservation Plan. The provisions of this section apply to the highly erodible land conservation requirements of the Agricultural Lands Easement Program and are not intended to affect any other natural resources conservation requirements to which the Grantor may be or become subject.

**II.  Restricted Uses of Protected Property**

The restrictions hereby imposed upon the Protected Property and the uses that are prohibited, except as may be specifically permitted in Section III of this Grant, are as follows:

    1.  *Residential and commercial use*. No residential, commercial, industrial, or mining activities shall be permitted, and no building, structure or appurtenant facility or improvement shall be constructed, created, installed, erected, or moved onto the Protected Property, except as specifically permitted under this Grant.

    2.  *Granting of Easements*. No new rights-of-way, easements of ingress or egress, driveways, roads, utility lines, other easements, or other use restrictions shall be constructed, developed, granted, or maintained into, on, over, under, or across the Protected Property, without the prior written

permission of Grantees. Grantees may grant permission for any rights-of-way, easements of ingress or egress, driveways, roads, utility lines, other easements, or other use restrictions, if they determine, in their sole discretion, that any such rights-of-way, easements of ingress or egress, driveways, roads, utility lines, other easements or other use restrictions are consistent with the Purposes of this Grant.

3. *Signage.* No signs, billboards, or outdoor advertising of any kind shall be erected or displayed on the Protected Property. Grantor, however, may erect and maintain reasonable: (a) signs indicating the name of the Protected Property, (b) boundary markers, (c) directional signs, (d) signs regarding hunting, fishing, trapping, trespassing on the Protected Property or signs otherwise regarding public access to the Protected Property, (e) memorial plaques, (f) temporary signs indicating that the Protected Property is for sale or lease, (g) signs informing the public that any agricultural or timber products are for sale or are being grown on the Protected Property, (h) political or religious signs, or (i) signs informing the public of any rural enterprise approved pursuant to Section III below. Grantees, with the permission of Grantor, may erect and maintain signs designating the Protected Property as land under the protection of Grantees.

4. *Waste and Dumping.* No placement, collection, or storage of trash, refuse, human waste, or any other harmful or offensive material on the Protected Property shall be permitted except at such locations, if any, and in such a manner as shall be approved in advance in writing by Grantees, which approval shall not be unreasonably withheld if such placement, collection or storage is consistent with the Purposes of this Grant. The on-site storage and spreading of agricultural inputs including, but not limited to, lime, fertilizer, pesticides, compost or manure for agricultural practices and purposes, the storage of feed, and the temporary storage of trash generated on the Protected Property in receptacles for periodic off-site disposal, shall be permitted without such prior written approval.

5. *Surface Alteration.* No disturbance of the surface, including but not limited to, filling, excavation, removal of topsoil, sand, gravel, rocks or minerals, or change of the topography of the land shall be permitted, except as may be reasonably necessary to carry out the uses permitted on the Protected Property under this Grant.

6. *Oil, Gas, or Mineral Exploration and Extraction.* Mining or extraction of soil, sand, gravel, oil, natural gas, fuel, coal, or any other mineral substance owned by Grantor as of the date of this Grant or later acquired by Grantor, using any surface mining, subsurface mining, or dredging method, from the Protected Property is prohibited, except for limited mining activities for materials (e.g. sand, gravel, or shale) used for agricultural operations on the Protected Property and other property owned by Grantor. Extraction of materials used for agricultural operations, must be limited to a small, defined area or acreage and must not adversely impact the conservation values or the agricultural uses of the Protected Property. In no case shall surface mining of subsurface oil, gas, or other minerals be permitted. If a third party owns or leases the oil, natural gas, or any other mineral substance at the time this Grant is executed, and their interests have not been subordinated to this Grant, the Grantor must require, to the greatest extent possible, that any oil, natural gas, and mineral exploration and extraction conducted by such third party is conducted in accordance with this paragraph 6.

7. *Subdivision.* For the purposes of this Grant, the Protected Property shall be considered one (1) parcel of land. The Protected Property shall not be subdivided, partitioned, or conveyed in separate parcels, nor shall ownership of the buildings on the Protected Property be separated from the ownership of the Protected Property without the prior written approval of Grantees, which approval may be granted, conditioned or denied in Grantees' sole discretion except as otherwise specifically permitted in this Grant. To protect the agricultural use and future agricultural viability and related conservation values of the Protected Property, the boundaries of such division(s) must be approved in writing by Grantees and NRCS before any such division, subdivision or separate conveyance occurs.

8. *Limitation on Impervious Surfaces.* Impervious surfaces will not exceed 5% of the Protected Property, excluding NRCS-approved conservation practices. Impervious surfaces are defined as material that does not allow water to percolate into the soil on the Protected Property; including, but not limited to, residential buildings, agricultural buildings with or without flooring, paved areas, and any other surfaces that are covered by asphalt, concrete, or roofs. This limitation does not include public roads or other roads owned and controlled by parties with superior rights to those rights conveyed to Grantees by this Grant.

In the event the Protected Property is subdivided as provided for in Section II(7) above or Section III(9) below, the total cumulative impervious surface of the subdivided parcels shall not exceed the impervious limitation referenced above. The Grantor, with Grantees' approval, shall allocate the impervious surface limit among the subdivided parcels and ensure said impervious surface limitation is clearly defined in each subdivided parcel's recorded instrument.

9. *Future Activity.* No use shall be made of the Protected Property, and no activity thereon shall be permitted which is or is likely to become inconsistent with the Purposes of this Grant. Grantor and Grantees acknowledge that, in view of the perpetual nature of this Grant, they are unable to foresee all potential future land uses, future technologies, and future evolution of the land and other natural resources, and other future occurrences affecting the Purposes of this Grant. Grantees, therefore, in their sole discretion, may determine whether (a) proposed uses or proposed improvements not contemplated by or addressed in this Grant, or (b) alterations in existing uses or structures, are consistent with the Purposes of this Grant.

**III.    Permitted Uses of the Protected Property.**

Without limiting the general applicability of the foregoing, the Protected Property shall be used for agricultural, forestry, education, non-commercial recreation, and open space purposes. Grantor has the right to make the following uses of the Protected Property:

1. *Agricultural Production.* The production, processing, and marketing of agricultural crops and livestock is permitted provided these activities are conducted in a manner not inconsistent with the terms of the HEL Conservation Plan, if applicable.

2. *Agricultural Uses.* The right to establish, re-establish, maintain, and use cultivated fields, orchards, and pastures together with the right to construct, maintain, and repair fences and gravel or other permeable surfaced access roads for these purposes, all in accordance with sound agricultural practices and sound husbandry principles; provided, however, that Grantor shall obtain Grantees' prior written approval to clearcut forest land to establish fields, orchards or pastures. Grantees' approval shall not be unreasonably withheld if such clearcutting is consistent with the Purposes of this Grant.

3. *Fallow Land.* Each time that the agricultural land on the Protected Property lies fallow for more than two successive years (the "fallow land"), Grantor shall cooperate with Grantees, at Grantees' request, to maintain the fallow land in an open condition (meaning without trees and brush) and in active agricultural use. For example, Grantor shall permit access to the fallow land by Grantees and Grantees' contractors to crop, mow, or brush-hog. No obligation is hereby imposed upon Grantor or Grantees to maintain the fallow land in an open condition or in active agricultural use.

4. *Maple Sugaring and Forest Management Plans.* The right to conduct maple-sugaring operations and harvest firewood for heating residences and structures located on the Protected Property, or on other land owned by Grantor but excluded from this Grant, on existing woods roads only, <u>without</u> submission and approval of a forest management plan. The right to conduct commercial timber harvests, including harvests that support a sugaring operation, together with the right to construct and maintain roads necessary for such activities, in accordance with sound forestry practices and in accordance with a forest management plan for which Grantor has received the prior written approval of Grantees. Grantees' approval of forest management plans that may be submitted from time to time shall not be unreasonably withheld or conditioned, if such plans have been approved by a professional forester and if such plans are consistent with the Purposes of this Grant.

5. *Trails.* The right to clear, construct, and maintain trails for non-commercial walking, horseback riding, skiing, and other non-commercial, non-motorized recreational activities within and across the Protected Property. Non-commercial snowmobiling may be permitted at the discretion of Grantor.

6. *On-Farm Energy Production.* Renewable energy production is allowed for the purpose of generating energy for the agricultural and residential needs of the Protected Property. Renewable energy sources must be approved by Grantees', in their sole discretion, and at a minimum shall be built and maintained within impervious surface limits, with minimal impact on the conservation values of the Protected Property and consistent with the Purposes of this Grant, as determined by Grantees. The sale of excess electric power is allowed provided that it is generated in the operation of renewable energy structures and associated equipment or other energy structures that Grantees have previously approved in writing as being consistent with the Purposes of this Grant.

7. *Non-Residential Buildings.* The right to construct, maintain, repair, renovate, replace, enlarge, rebuild, and use new and existing barns, sugar houses, or similar non-residential structures or facilities, together with necessary access drives and utilities for agricultural and forestry uses, on the Protected Property; provided, however, that (a) the structures are used exclusively for agricultural or forestry purposes, and (b) any new construction, other than normal maintenance and repair, has been approved in writing in advance by Grantees. Grantees' approval may include designation of a "Complex" (meaning an area or areas of the Protected Property within which certain structures are or shall be

grouped together) surrounding the structures and shall not otherwise be unreasonably withheld or conditioned; provided, however, that the structure or other improvement is located in a manner which is consistent with the Purposes of this Grant. Grantor shall not deem unreasonable a condition by Grantees that certain structures must be located within an existing Complex or a Complex which may be designated in the future as provided in this Section III.

8. *Farmstead Complexes.* The right to maintain, repair, renovate, replace, enlarge, rebuild, and use: (a) the existing farm buildings for non-residential, agricultural uses, (b) the existing non-residential appurtenant structures and improvements, including drives and utilities, normally associated with a dwelling or farm, and (c) maintain, repair, renovate, replace, enlarge, rebuild, use and occupy the existing two (2) single-family dwellings located in the South Complex and the one (1) single family dwelling located in the West Complex, as defined below, for residential purposes, new farm buildings for non-residential, agricultural uses and appurtenant structures and improvements, including drives and utilities, normally associated with a dwelling or farm, all within the designated Farmstead Complexes without the prior written approval of Grantees. The three single-family dwellings located in the Farmstead Complexes may be converted to a duplex without Grantees' prior approval, or converted into more than two residential units with Grantees' prior written approval, such approval to be granted in Grantees' sole discretion. The Farmstead Complexes are two areas, the South Complex consisting of 14.5 acres, more or less, and the West Complex consisting of 8 acres more or less, and are more particularly described in Schedule B attached hereto and incorporated herein, and are depicted on the Parent P&S Farm Conservation Plan described in Schedule A attached hereto and incorporated herein. Grantor shall notify Grantees in writing prior to commencing construction on any new structure or improvement within the Farmstead Complexes. With the prior written approval of Grantees, the right to construct, maintain, repair, replace, relocate, improve and use systems for disposal of human waste and for supply of water for human consumption (collectively "Systems") on the Protected Property outside of the Farmstead Complexes for the benefit of buildings or structures permitted in the Farmstead Complexes, provided that such Systems comply with Vermont Department of Environmental Conservation Wastewater System and Potable Water Supply Rules or the then applicable law or regulations governing Systems (collectively, the "Rules").

9. *Pre-Approved Subdivision.* Notwithstanding Section II(7) above, the right to separately convey the Protected Property into two separate farm units: one unit consisting of that portion of the Protected Property situated on the northerly side of Vermont Route #105 (the 235 acre "North Unit"), and the other unit consisting of that portion of the Protected Property situated on the southerly side of Vermont Route #105 (the 44 acre "South Unit"), as depicted on the Parent P& S Farm Conservation Plan described in Schedule A attached hereto and incorporated herein. Grantor shall obtain the prior written approval of Grantees for any such separate conveyance, which approval shall not be unreasonably withheld or conditioned, provided that 1) the configuration and boundaries of the two farm units are as described in this Section III(9), as depicted on the Parent P&S Farm Conservation Plan, and 2) the Grantor pays to the Grantees a sum equal to the customary stewardship endowment amount assessed by the Grantees then applicable for the parcel to be conveyed to support the additional monitoring and enforcement costs incurred by Grantees as a result of the separate conveyance, payable at the time of the approval. The resulting two parcels of land shall remain subject to this Grant.

10. *Farm Labor Housing.* The right to construct, maintain, repair, renovate, replace, enlarge, rebuild, and use one (1) additional farm labor housing unit "FLH", together with appurtenant non-residential structures and improvements, including drives and utilities, normally associated with a residence; provided, however, that the FLH shall be (a) occupied by Grantor or at least one person who is a member of Grantor's family or who is employed on the farm, and (b) located in a Complex and (c) located on the parcel north of Vermont Route 105. Notwithstanding the foregoing, Grantees may approve, deny or condition in their sole discretion, the right to locate the FLH outside a Complex. With the prior written approval of Grantees, the right to construct, maintain, repair, replace, relocate, improve and use Systems on the Protected Property outside of the Complex for the benefit of buildings or structures permitted in the Complex, provided that such Systems comply with the Rules. The FLH shall consist of no more than 2,500 square feet of total floor area measured from the exterior walls, excluding the attic crawl space, attached garage, and any floor completely below grade level. Grantees in their sole discretion may permit an increase over the 2,500 square foot limit, provided, however, such larger structure is deemed necessary and found by Grantees to have no greater negative impact on the conservation values and affordability goals underlying the Purposes of this Grant than the original size. In the event the FLH is not required for housing a farm employee, Grantor, or a member of Grantor's family, Grantor may rent the FLH to other persons for successive lease terms not to exceed one year each, but shall not otherwise transfer ownership or possession of the FLH. The FLH shall not be conveyed separately from the Protected Property, but may be subdivided with the prior written approval of Grantees if such subdivision is required by state or local regulation.

11.     *Right to Seek Approval for Additional Farm Labor Housing.*  For the purpose of providing housing exclusively for Grantor who is engaged in farming operations on the Protected Property or for persons employed by the Grantor in farming operations on the Protected Property, and for the employee's family or household members, as a nonmonetary benefit of farm employment, the right to construct, use, maintain, repair, renovate, replace, enlarge and rebuild farm labor housing which may be within an existing building or a new building (the "FLH") together with appurtenant non-residential structures and improvements, including drives, utilities, normally associated with a residence; provided, however, that prior to construction, renovation, replacement, enlargement or rebuilding Grantor shall obtain Grantees' written approval which, in Grantees' sole discretion, may be withheld or given subject to such conditions as the Grantees deem appropriate, if Grantor demonstrates to Grantees' satisfaction that the FLH or alteration thereto is:

   a)   necessary to the current and reasonably foreseeable farm business on the Protected Property in order to facilitate the active and long-term economically viable agricultural use of the Protected Property; and

   b)   designed and sized to be no larger than is necessary to meet the needs of the current and reasonably foreseeable farm business on the Protected Property and to ensure that the Protected Property remains available for production agriculture, affordable and owned by persons actively engaged in farming; and

   c)   otherwise consistent with the Purposes of the Grant.

Notwithstanding the foregoing, with the prior written approval of Grantees, the right to construct, maintain, repair, replace, relocate, improve and use Systems on the Protected Property outside of a Complex for the benefit of buildings or structures permitted in the Complex, provided that such Systems comply with the Rules.

If the FLH is not needed for farm labor housing in the future, temporary alternative uses of the structure deemed by the Grantees in their sole discretion to be consistent with the Purposes of this Grant may be permitted with the prior written approval of the Grantees.

12.     *Rural Enterprises.*  The right to conduct rural enterprises consistent with the Purposes of this Grant, especially the economically viable use of the Protected Property for agriculture, forestry and open space and the conservation of agriculturally and silviculturally productive land.  In connection with such rural enterprises, the right to maintain, repair, enlarge, replace and use permitted structures with associated utility services, drives and appurtenant improvements within a Farmstead Complex, or other designated complex permitted by this Section III.  Grantees may approve a new, non-residential, structure for an approved rural enterprise only if an existing structure is not suitable and the new structure is:

   a)   of a nature, intensity, scope, size, appearance, type and quantity compatible with the existing agricultural structures;
   b)   located in a way that minimizes negative impact on current and future agricultural operations; and,
   c)   not inconsistent with the Purposes of this Grant.

No use or structure contemplated under this Section III(12) shall be commenced, constructed or located without first securing the prior written approval of Grantees, which approval Grantees may deny or condition in their sole discretion.

13.     *Wastewater Systems.*  The right to construct, maintain, repair, replace, relocate, improve and use Systems on the Protected Property for one exclusion located on the two-acre parcel of land owned by the original Grantor herein at the date of this Grant but excluded from the Protected Property under Schedule A hereto ("Exclusion").  Any such Systems may be constructed, maintained, operated, repaired, replaced, relocated or improved on the Protected Property only if there does not exist within the Exclusion, any suitable location for such Systems, the Rules, as determined by a person authorized to make such determination under the Rules retained at Grantor's sole cost and expense.  Grantor shall first obtain the written approval of Grantees for the location, relocation, replacement or improvement of such Systems on the Protected Property, which approval shall not be unreasonably withheld nor conditioned, provided that:

   a)   All reasonable attempts to locate, relocate, replace or improve the Systems within the Exclusion in a manner that complies with the then current Rules are exhausted; and
   b)   Such Systems are located in a manner consistent with the Purposes of this Grant and especially minimize the loss of agricultural soils; and

c)  Such Systems are designed by a person authorized to do so under the Rules retained at Grantor's sole cost and expense, certified by such person as complying with the Rules, installed in compliance with the Rules, certified by person authorized to do so under the Rules as being installed in accordance with the certified design and approved in accordance with all the then applicable Rules.

In the event that Grantor has obtained Grantees' approval for a System serving the Exclusion, Grantor shall have the right to convey legal access to the successor owners of the Exclusion for construction, operation and maintenance of the System as an appurtenance only to the Exclusion and subject to the restrictions set forth in Section II(2) of this Grant.

14. *Camp Clause.* The right to construct, use, maintain, repair and replace one (1) camp being no more than fifteen (15) feet high as measured from the average undisturbed ground level to the roof peak and no more than 600 square feet in total useable floor area, however, that any such structure shall be used exclusively for non-commercial, periodic camping, hunting and recreational purposes, and not for permanent occupancy; shall not have commercial utility services or an access road improved beyond what is minimally required to afford reasonable vehicular access; and shall be located on non-agricultural land; and shall not be located within the Riparian Buffer Zone described in Section IV and the Wetland Protection Zone described in Section V. Grantor shall notify Grantees in writing prior to commencing the placement, construction or relocation of such permitted structure or access so that Grantees may review and approve the proposed location and dimensions of the camp and access as an additional designated Complex for such non-commercial camping, hunting and recreational purposes only, in order to ensure that the dimensions of the structure are in compliance with this section and the camp and access are located in a manner consistent with the Purposes of this Grant.

15. *Minor Structures Clause.* The right to construct, use, maintain, repair and replace a minimal number of non-permanent tent platform, lean-to or Adirondack shelter not to exceed 300 square feet in area provided, however, that any such structure shall be used exclusively for non-commercial, periodic camping, hunting and recreational purposes, and not for permanent occupancy; shall not have commercial utility services or an access road improved beyond what is minimally required to afford reasonable vehicular access. Grantor shall notify Grantees in writing prior to commencing the placement, construction or relocation of such permitted structure or access so that Grantees may review and approve the proposed location and dimensions of the structure and access, in order to ensure that the dimensions of the structure are in compliance with this Section and the structure and access are located in a manner consistent with the Purposes of this Grant. In addition, Grantor may place a limited number of small hunting blinds on the Property in order to carry-out permitted hunting activities, provided that the location of such blinds must be consistent with the Purposes of this Grant.

## IV.  Riparian Buffer Zone

The Protected Property includes certain lands and premises lying northerly of the Missisquoi River subject to special protections as set forth herein to protect the water quality of such waterways and the ecological health of the natural systems associated with such waterways. Notwithstanding anything to the contrary contained in this Section, in the event that Grantor conveys a grant of conservation buffer easement, river corridor easement or a similar set of restrictions protecting water quality, riparian habitat and river function ("Buffer Easement") to Grantee VLT, then such Buffer Easement shall control and the terms of this Section shall no longer be in effect so long as such Buffer Easement remains in full force and effect. The location of and the restrictions applicable to these areas are as follows:

Those areas on the Protected Property lying within fifty feet (50') of the top of the banks of the Missisiqoi River as those waters may move from time to time, and also including any land located between the said tops of banks and the low water marks of such waterways, shall be designated as Riparian Buffer Zones (hereinafter "RBZ"). The location of the RBZ as of the date of this Grant is generally depicted on the Parent P&S Farm Conservation Plan, described in Schedule A attached hereto. Within the RBZ, the goals, prescriptions and restrictions of this Section are in addition to the provisions of Sections II and III, and where inconsistent, the provisions of this Section shall control.

Specifically, the principal goal for management within the RBZ is the establishment and maintenance of high quality buffers that provide an array of ecological benefits including, but not limited to:

(i) buffering aquatic and wetland plants and animals from disturbance;
(ii) preventing wetland and water-quality degradation;
(iii) providing important plant and animal habitat; and

(iv)   providing organic matter, nutrients, and structure to aquatic systems.

Any management or use of the RBZ shall be conducted in a manner designed to protect soil integrity and minimize erosion, shall incorporate up-to-date ecological knowledge and management practices, and shall be consistent with the principal goal detailed above. Without limiting the foregoing, any forest management activities within the RBZ (including without limitation the installation of new roads and trails) shall require Grantees' prior approval.

There shall be no agricultural activities (including without limitation the grazing or pasturing of animals) within the RBZ, except as may be approved in Grantees' sole discretion

V.   **Wetland Protection Zone**

The Protected Property includes certain lands containing and buffering wetlands hereby made subject to special protections to protect the water quality and the ecological processes associated with such wetlands. Such wetlands are herein designated as the "Wetland Protection Zone" or "WPZ." The WPZ is more particularly described a low-lying riparian area and is generally depicted as "WPZ" on the Parent P&S Farm Conservation Plan. The boundaries of the WPZ may be changed from time to time by mutual agreement of Grantor and Grantees, as established by and depicted on a new Conservation Plan signed by Grantor and Grantees and maintained on file with Grantee VLT.

Within the WPZ, the goals, prescriptions, and restrictions of this Section are in addition to the provisions of Sections II and III of this Grant, and where inconsistent, the provisions of this Section (V) shall control.

Within the WPZ the following shall apply:

1.   Protection or restoration of the ecological functions of the wetland natural communities, as well as the natural communities that naturally develop in the future in the WPZ, and the ecological processes that sustain them, shall be Grantor's and Grantees' highest priority.

2.   All management activities, including without limitation forest management and ecological management, shall focus on the goals of a) maintaining or restoring soil integrity, natural hydrology, and water quality, and b) maintaining the natural structure and species composition of the natural communities present or communities that may develop naturally over time, informed by the best current ecological science.

3.   There shall be no agricultural activities (including without limitation the grazing or pasturing of animals), except as may be approved by Grantees in their sole discretion.

4.   All forest management activities shall be conducted pursuant to a forest management plan that is consistent with the Purposes of this Grant and this Section. Without limiting the foregoing, the installation of new roads and trails shall require Grantees' prior written approval.

In the context of acting under this Section, Grantor and Grantees may confer about what constitutes the best available ecological science; provided that, Grantees' interpretation thereof shall control.

VI.   **Enforcement of the Covenants and Restrictions.**

Grantees shall make reasonable efforts to assure compliance by Grantor with all of the covenants and restrictions herein.  In connection with such efforts, Grantees may make periodic inspection of all or any portion of the Protected Property, and for such inspection and enforcement purposes, Grantees shall have the right of reasonable access to the Protected Property.  In the event that a Grantee becomes aware of an event or circumstance of non-compliance with this Grant, such Grantee shall give notice to Grantor and the other Grantees of such event or circumstance of non-compliance.  With respect to Grantor, notice shall be via certified mail, return receipt requested, and demand corrective action by Grantor sufficient to abate such event or circumstance of non-compliance and restore the Protected Property to its previous condition.  If Grantees, in their sole discretion, determine that the event or circumstance of noncompliance requires immediate action to prevent or mitigate significant damage to the conservation values of the Protected Property as provided in the Purposes of this Grant, then Grantees may pursue their rights under this enforcement section without prior notice to Grantor.  In the event there has been an event or circumstance of non-compliance which is corrected through negotiation and voluntary compliance, but which has caused Grantees to incur extraordinary costs, including without limitation staff time and professional consultation costs, in investigating the non-compliance and securing its correction, Grantor shall, at Grantees' request, reimburse Grantees for all such costs incurred in investigating the non-compliance and in securing its correction.

Failure by Grantor to cause discontinuance, abatement, or such other corrective action as may be demanded by Grantees within a reasonable time after receipt of notice and reasonable opportunity to take corrective action shall entitle Grantees to bring an action in a court of competent jurisdiction to enforce the terms of this Grant and to recover any damages arising from such non-compliance. Such damages, when recovered, may be applied by Grantees to corrective action on the Protected Property. If the court determines that Grantor has failed to comply with this Grant, Grantor shall reimburse Grantees for any reasonable costs of enforcement, including court costs and reasonable attorneys' fees, in addition to any other payments ordered by such court. In the event that a Grantee initiates litigation and the court determines that Grantor has not failed to comply with this Grant and that one or more of Grantees have initiated litigation without reasonable cause or in bad faith, then the Grantees who commenced the court proceedings shall reimburse Grantor for any reasonable costs of defending such action, including court costs and reasonable attorneys' fees; provided, however, that this clause shall not apply to the United States.

Grantor is responsible for the acts and omissions of persons acting on Grantor's behalf, at Grantor's direction or with Grantor's permission, and Grantees shall have the right to enforce against Grantor for events or circumstances of non-compliance with this Grant resulting from such acts or omissions. However, as to the acts or omissions of third parties other than the aforesaid persons, Grantees shall not have a right to enforce this Grant against Grantor unless Grantor: (i) is complicit in said acts or omissions, (ii) fails to cooperate with Grantees in all respects to halt or abate the event or circumstance of non-compliance resulting from such acts or omissions, or (iii) fails to report such acts or omissions to Grantees promptly upon learning of them. Nor shall Grantees institute any enforcement proceeding against Grantor for any change to the Protected Property caused by natural disasters such as fire, flood, storm or earthquake.

Grantees shall have the right, but not the obligation, to pursue all legal and equitable remedies against any third party responsible for an event or circumstance of non-compliance with this Grant and Grantor shall, at Grantees' direction, assign Grantor's right of action against such third party to Grantees, join Grantees in any suit or action against such third party, or appoint a Grantee as Grantor's attorney in fact for the purpose of pursuing an enforcement suit or action against such third party.

The parties to this Grant specifically acknowledge that events and circumstances of non-compliance constitute immediate and irreparable injury, loss, and damage to the Protected Property and accordingly entitle Grantees to such equitable relief, including but not limited to, injunctive relief, as the court deems just and appropriate. The remedies described herein are in addition to, and not in limitation of, any other remedies available to Grantees at law, in equity, or through administrative proceedings.

No delay or omission by Grantees in the exercise of any right or remedy upon any breach by Grantor shall impair Grantees' rights or remedies or be construed as a waiver.

**VII.    Protection of the United States of America's Interests.**

1.    **United States Right of Enforcement**. Pursuant to 16 U.S.C. Section 3865 et seq., the United States is granted the right of enforcement that it may exercise only if the terms of this Grant are not enforced by Grantees. The Secretary of the United States Department of Agriculture (the Secretary) or his or her assigns, on behalf of the United States, may exercise this right of enforcement under any authority available under State or Federal law if the Grantees, or their successors or assigns, fail to enforce any of the terms of this Grant, as determined in the sole discretion of the Secretary.

In the event the United States exercises this right of enforcement, it is entitled to recover any and all administrative and legal costs associated with any enforcement or remedial action related to the enforcement of this Grant from the Grantor, including, but not limited to, attorney's fees and expenses related to Grantor's violations. In the event the United States exercises this right of enforcement, and to the extent not recovered from the Grantor first, it is entitled to recover any and all administrative and legal costs associated with any enforcement of this Grant from the Grantees, including, but not limited, attorney's fees and expenses related to Grantees' violations or failure to enforce the Grant against the Grantor, up to the amount of the United States contribution to the purchase of the Grant.

The Grantees will annually monitor compliance and provide the United States with an annual monitoring report that documents that the Grantees and Grantor are in compliance with the Grant. If the annual monitoring report is insufficient or is not provided annually, or if the United States has a reasonable and articulable belief of an unaddressed violation, as determined by the Secretary, the United States may exercise its right of inspection. For purposes of inspection and enforcement of the terms of this Grant, the HEL Conservation Plan and the United States Cooperative Agreement with the Grantees,

the United States will have reasonable access to the Protected Property. Prior to its inspection of the Protected Property, the United States shall provide advance notice to Grantees and Grantor and provide Grantees and Grantor a reasonable opportunity to participate in the inspection.

In the event of an emergency, the United States may enter the Protected Property to prevent, terminate, or mitigate a potential or unaddressed violation of this Grant and will give notice to Grantees and Grantor or Grantor's representative at the earliest practicable time.

2. **General Disclaimer and Grantor Warranty**. The United States, its employees, agents, and assigns disclaim and will not be held responsible for Grantees' or Grantor's negligent acts or omissions or Grantees' or Grantor's breach of any representation, warranty, covenant, or agreements contained in this Grant, or violations of any Federal, State, or local laws, including all Environmental Laws (as defined below) including, without limitation, those that give rise to liabilities, claims, demands, losses, expenses, damages, fines, fees, penalties, suits, proceedings, actions, costs of actions, or sanctions asserted by or on behalf of any person or governmental authority, and other liabilities (whether legal or equitable in nature and including, without limitation, court costs, and reasonable attorneys' fees and attorneys' fees on appeal) to which the United States may be subject or incur relating to the Protected Property.

Grantor must indemnify and hold harmless the United States, its employees, agents, and assigns for any and all liabilities, claims, demands, losses, expenses, damages, fines, fees, penalties, suits, proceedings, actions and costs of actions, sanctions asserted by or on behalf of any person or governmental authority, and other liabilities (whether legal or equitable in nature and including, without limitation, court costs, and reasonable attorneys' fees and attorneys' fees on appeal) to which the United States may be subject or incur relating to the Protected Property, which may arise from, but are not limited to, Grantor's negligent acts, omissions, or breach of any representation, warranty, covenant, agreements contained in this Grant or violations of any Federal, State, or local laws, including all Environmental Laws (defined below).

3. **Environmental Warranty**. As used herein, "Environmental Law" or "Environmental Laws" means any and all Federal, State, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, guidelines, policies, or requirements of any governmental authority regulating or imposing standards of liability or standards of conduct (including common law) concerning air, water, solid waste, hazardous materials, worker and community right-to-know, hazard communication, noise, radioactive material, resource protection, subdivision, inland wetlands and watercourses, health protection, and similar environmental health, safety, building, and land use as may now or at any time hereafter be in effect.

As used herein, "Hazardous Materials" means any petroleum, petroleum products, fuel oil, waste oils, explosives, reactive materials, ignitable materials, corrosive materials, hazardous chemicals, hazardous wastes, hazardous substances, extremely hazardous substances, toxic substances, toxic chemicals, radioactive materials, infectious materials, and any other element, compound, mixture, solution, or substance that may pose a present or potential hazard to human health or the environment.

Grantor warrants that it is in compliance with, and will remain in compliance with, all applicable Environmental Laws. Grantor warrants that there are no notices by any governmental authority of any violation or alleged violation of, noncompliance or alleged noncompliance with, or any liability under, any Environmental Law relating to the operations or conditions of the Protected Property. Grantor further warrants that it has no actual knowledge of an undisclosed release or threatened release of Hazardous Materials, as such substances and wastes are defined by applicable Federal and State law.

Furthermore, Grantor warrants the information disclosed to Grantees and United States regarding any past violations or noncompliance with Environmental Laws and associated remedial actions, or any past releases of Hazardous Materials and any associated remedial actions is complete and accurate.

Moreover, Grantor hereby promises to hold harmless and indemnify Grantees and the United States against all litigation, claims, demands, penalties and damages, including reasonable attorneys' fees, arising from or connected with the release or threatened release of any hazardous materials on, at, beneath or from the Protected Property, or arising from or connected with a violation of any Environmental Laws by Grantor or any other prior owner of the Protected Property. Grantor's indemnification obligation will not be affected by any authorizations provided by Grantees or the United States to Grantor with respect to the Protected Property or any restoration activities carried out by Grantees on the Protected Property; provided, however, that Grantees will be responsible for any Hazardous Materials contributed after this date to the Protected Property by Grantees.

VIII.   **Option to Purchase at Agricultural Value**.

Grantees shall have an option to purchase the Protected Property at its agricultural value in accordance with the terms and provisions of this Section ("this Option"). This Option is an integral part of this Grant and constitutes a restriction and a right and interest in real property that runs with the land. This Option shall be perpetual in duration and is given on the following terms and conditions.

1.   **Option Trigger**. Grantor shall not sell, transfer or convey the Protected Property, in whole or in part, without first offering the Protected Property for sale to Grantees pursuant to this Section; provided, however, that the following described transactions shall not trigger Grantees' rights under this Option:

   a)   Any mortgage, pledge, or other assignment of the Protected Property to a lender as security for indebtedness, provided the Grantees' interest under this Option is treated as an interest in real estate such that in the event of foreclosure Grantees are deemed necessary parties defendant in such foreclosure case and have the right to redeem the Protected Property from the foreclosure action; and

   b)   Any conveyance by the Grantor to Grantor's family, as the latter term is defined in Section IX(8) below, by gift, inheritance, sale or other transfer; and

   c)   Any conveyance of the Protected Property to a person who presently earns at least one-half of his or her annual gross income from the "business of farming," as that term is defined in Regulation 1.175-3 issued under the Internal Revenue Code of 1986 and who, in connection with the farming operations on the Protected Property, will continue to earn at least one-half of his or her annual gross income from the "business of farming" ("a Qualified Farmer"); and

   d)   Any lease to a Qualified Farmer or a lease having a term of 15 years or less, including renewal rights; provided, however, that any such lease shall expressly provide that, unless otherwise agreed by Grantees, the lease shall terminate and possession shall be delivered free and clear of any rights of the tenant upon a closing of the sale of the Protected Property following exercise of this Option.

This Option shall apply to all other sales and conveyances of the Protected Property, including any sale or conveyance of any interest in the Protected Property including any conveyance by, or conveyance of any interest in a corporation, limited liability company, partnership or other holding entity.

2.   **Notice of Intent to Sell**. Whenever Grantor receives an offer from a person or persons ("Buyer") to purchase or lease for a term in excess of fifteen (15) years, including renewal rights, all or any part of the Protected Property including an offer involving property other than the Protected Property ("the Offer"), and Grantor accepts the Offer subject to this Option, Grantor shall deliver to Grantees at their principal places of business by certified mail, return receipt requested, a Notice of Intent to Sell, which notice shall include:

   a)   A complete duplicate of the Offer, together with such other instruments as may be required to show the bona fides of the Offer; and

   b)   A written description of the Buyer's training and experience as an agricultural producer and an agricultural business plan for the Protected Property, including a description of the agricultural activities to be conducted or facilitated by Buyer, proposed improvements to the Protected Property, and a statement of anticipated agricultural income and expenses for the three-year period following Buyer's acquisition of the Protected Property or, if Buyer has no such training and experience or intention of operating an agricultural business on the Protected Property, a written statement to that effect; and

   c)   If the Buyer is purported to be a Qualified Farmer or family member, the documents necessary to establish the Buyer as such, including the Buyer's most recent federal income tax filing, if applicable; and

   d)   The Grantor's current mailing address.

Information delivered to Grantees pursuant to this clause shall remain confidential and shall not be released to any person or entity not a party to this Grant, without the prior consent of Grantor.

3.  **Exercise of Option**. This Option may be exercised by Grantees as follows:

    a)  A Grantee shall give written Notice of Intent to Exercise not more than thirty (30) days following receipt of the Notice of Intent to Sell described in Section VIII(2); failure by a Grantee to provide such notice shall constitute a waiver of its rights under this Option; and

    b)  Thereafter, Grantor and Grantee shall fix the purchase price for the Protected Property by establishing a Price Agreement in the manner described in Section VIII(4), below.

    c)  A Grantee shall exercise this Option by giving written Notice of Intent to Purchase not more than thirty (30) days following Grantor's and Grantee's establishment of the Price Agreement.

Notices required by this Section VIII(3) shall be delivered to Grantor either personally or by certified mail, return receipt requested to the address provided by Grantor in the Notice of Intent to Sell described in Section VIII(2), above. In the event that more than one Grantee exercises this Option, the Vermont Land Trust, Inc. shall have first priority, and the Vermont Housing and Conservation Board second priority. The Grantee with highest priority which exercises this Option is hereafter referred to in Sections VIII(4), (5) and (6) as "Grantee."

4.  **Purchase Price**. The Purchase Price shall be determined by mutual agreement of Grantor and Grantee; provided that if no such agreement can be reached, the purchase price of the land only shall be the greater of:

    a-1) $464,000 plus an inflation adjustment determined by multiplying the foregoing value by 1 (one) plus the fractional increase calculated from the date hereof in the Consumer Price Index for all Urban Consumers, Northeast, All Items published by the Bureau of Labor Statistics, U.S. Department of Labor, or a successor index published by the United States government to the date of the Offer; or

    a-2) The full fair market value of all Protected Property land subject to the Offer (including the site of any structures) assuming its highest and best use is commercial agricultural production commonly occurring within the market area where the Protected Property is located on the date of the Offer, as determined by a mutually approved disinterested appraiser selected by Grantor and Grantee, with the expense of such appraisal divided equally between Grantor and Grantee. Permanently installed land improvements, such as in-ground irrigation systems, farm roads, and drainage tiling shall be considered part of the land. This appraisal shall take into consideration the permitted and restricted uses set forth in, and the impact on value caused by the Grant.

With respect to any agricultural, forestry or minor incidental structures and improvements in existence as of the date of the Offer, then in addition to the foregoing land value, the Purchase Price shall also include:

    b)  The value of all such structures and improvements on the Protected Property as of the date of the Offer excluding all land (which is included in the Section VIII(4)(a) valuation, above). The value of the structures and improvements shall be determined using the replacement cost approach to valuation (i.e., the cost to replace the structures and improvements with those of comparable size and utility, less depreciation and functional obsolescence) by a mutually approved disinterested appraiser selected by Grantor and Grantee, with the expense of such appraisal divided equally between Grantor and Grantee.

With respect to any residence(s) in existence as of the date of the Offer, then in addition to the foregoing land value, the Purchase Price shall also include:

    c)  The value of the residence and its appurtenant structures and improvements as of the date of the Offer excluding the value of the land upon which these structures sit (which is included in the Section VIII(4)(a) valuation, above). The value of the residence and appurtenant structures and improvements shall be determined using the replacement cost approach to valuation (i.e., the cost to replace the residence, structures and improvements with those of comparable size and utility, less depreciation and functional obsolescence) by a mutually approved disinterested appraiser selected by Grantor and Grantee, with the expense of such appraisal divided equally between Grantor and Grantee.

Grantor and Grantee shall establish the Purchase Price by either entering into a written agreement fixing the Purchase Price as provided in this Section VIII(4), within ten working days of reaching mutual

agreement or, if no such agreement is reached, the Purchase Price shall be based upon the appraised values which shall be the Purchase Price unless another Purchase Price is mutually agreed upon in writing by the parties within ten working days after the last party's receipt of the appraisals. The passage of said ten working days shall constitute the effective date of establishing the Purchase Price. ("Price Agreement")

  5. **Entry onto the Protected Property**. After receiving the notice from Grantor described in Section VIII(2), above, and upon reasonable notice to the Grantor, the Grantee shall have the right to enter upon the Protected Property from time to time for the purpose of preparing for the purchase and disposition of the Protected Property, including but not limited, to preparing appraisals, conducting soils tests or engineering studies, advertising, showing prospective buyers or assignees, or obtaining other information about the Protected Property. Grantee's entry onto or testing of the Protected Property shall be conducted in a manner that minimizes any disturbance to the land and to the use and enjoyment of the Protected Property by the Grantor or any tenants in possession.

  6. **Closing of the Purchase**. If this Option is exercised, the parties shall close on the sale on or before thirty (30) days from the delivery of the Notice of Intent to Purchase described in Section VIII(3)(c), above, unless otherwise agreed. The following conditions shall apply to said closing:

  a) Grantor shall, by Vermont Warranty Deed, deliver good, clear, record and marketable title to the Grantee, free of all liens or other encumbrances (including discharge or release of outstanding mortgages), sufficient for the Grantee to secure title insurance at Grantee's sole expense. Grantee agrees to accept title subject to: (i) customary utility distribution easements, (ii) rights of the public to use roads laid out by municipalities, the state or federal government, (iii) rights of way and other easements that do not, in the Grantee's opinion, materially impair beneficial use of the Protected Property; and, (iv) the terms and conditions of this Grant. The state of title to the Protected Property shall be determined by a title examination paid for by the Grantee.

  b) Grantor agrees to use reasonable efforts to deliver marketable title as set forth in Section VIII(6)(a), above. In the event Grantor is unable to give marketable title, then the Grantee may elect to terminate its exercise of this Option. The Grantee shall have the right to elect to accept such title as Grantor can deliver and to pay the purchase price without reduction.

  c) Grantor agrees to obtain at Grantor's sole expense any and all permits and approvals required under law or regulation for the conveyance of the Protected Property to Grantee under this Option. The parties shall extend the closing date as necessary to enable Grantor to obtain all such final permits and approvals.

  d) Grantor represents to Grantee that Grantor is not aware of any hazardous waste having been dumped or placed upon the Protected Property. Grantor will update this representation in writing upon the Grantee's delivery of the Notice of Intent to Exercise described in Section VIII(3)(a), above. Grantor agrees that the Grantee may, at the Grantee's expense, perform any and all tests and/or inspections necessary to confirm these representations. In the event that the Grantee discovers that hazardous wastes have been dumped or placed upon the Protected Property, the Grantee may at the Grantee's option declare its exercise of this Option to be null and void.

  e) The Grantor and the Grantee shall prorate property taxes as of the date of closing.

  f) The Grantor shall not physically alter the Protected Property or the improvements on the Protected Property or enter into any lease after a Grantee delivers the Notice of Intent to Exercise provided in Section VIII(3)(a), above, and while the Grantee may purchase pursuant thereto, except to perform generally accepted agricultural practices and normal repairs. In the event any structure is substantially destroyed by fire or other casualty, Grantee may elect to (1) proceed to closing and accept the proceeds of any insurance policy Grantor may have with respect to such destruction; or (2) if such insurance proceeds are less than the value of the structure as determined under Section VIII(4), above, proceed to closing and accept the proceeds of said insurance policy and reduce the purchase price by the difference between such value and insurance proceeds; or (3) withdraw its election to exercise this Option.

  g) The Protected Property shall be conveyed free of all leases, tenancies, tenants and occupants, unless Grantee otherwise agrees in writing.

  h) All personal property, livestock, machinery and equipment not included in the sale shall

  be removed from the Protected Property, and all other waste and debris shall be removed from the Protected Property prior to closing. Grantor and Grantee will jointly inspect the Protected Property 24 hours prior to closing.

  i) After closing, this Option shall remain in full force and effect with respect to all subsequent conveyances of the Protected Property, except as identified in Section VIII(1), above.

  7. **Partial Release of Option**. At the request of Grantor, Grantees shall execute a partial release of their rights under this Option Agreement ("the Partial Release"), and upon the first to occur of the following events, the Grantees shall immediately deliver the Partial Release to the Sheldon Town Clerk for recording in the Sheldon Land Records.

  a) Grantees' failure to deliver the Notice of Intent to Exercise as described in Section VIII(3)(a), above;

  b) Grantees' failure to deliver the Notice of Intent to Purchase as described in Section VIII(3)(c), above; or

  c) Grantees' election to terminate its exercise of this Option based on title defects as provided in Section VIII(6)(b), hazardous materials as provided in Section VIII(6)(d), or destruction of structures as provided in Section VIII(6)(f).

Should no Grantee exercise this Option as provided in Section VIII(3), above, or should a Grantee fail to close following its delivery of the Notice of Intent to Purchase, Grantor may proceed to close on the sale to the Buyer on the terms and conditions described in the Notice of Intent to Sell, within twelve (12) months of the delivery of said Notice to Grantees. <u>Provided, however,</u> this Option shall remain in full force and effect with respect to all subsequent conveyances of the Protected Property, except as identified in Section VIII(1) above.

  8. **Partial Assignment by Grantees**. A Grantee may partially assign its rights under this Option, provided:

  a) No such assignment shall be made prior to Grantor and Grantee establishing the Price Agreement described in Section VIII(4), above;

  b) Such assignment shall be in writing, with the assignee undertaking to discharge all obligations of Grantee with respect to purchase of the Protected Property, and a copy of the written assignment shall be delivered to Grantor;

  c) The assignee shall be a party which, in the reasonable opinion of the Grantee, will use or will facilitate the use of the Protected Property for commercial agricultural production; and

  d) The partial assignment shall pertain only to a single exercise of this Option in response to a discrete Notice of Intent to Sell delivered to Grantees. While no consent of Grantor shall be required for said single exercise, no Grantee shall otherwise assign all of its rights and interests under this Option without the prior written consent of Grantor.

**IX.** **General Provisions**.

  1. Where Grantor is required, as a result of this Grant, to obtain the prior written approval of Grantees before commencing an activity or act, and where Grantees have designated in writing another organization or entity which shall have the authority to grant such approval, the approval of said designee shall be deemed to be the approval of Grantees. Grantor shall reimburse Grantees or Grantees' designee for all extraordinary costs, including staff time, incurred in reviewing the proposed action requiring Grantees' approval; but not to include those costs which are expected and routine in scope. Upon the request of Grantor, Grantees shall deliver to Grantor, in written recordable form, any approval, disapproval, election, or waiver given by Grantees pursuant to this Grant.

  2. Nothing in this Grant exempts the Grantor from following all applicable local, state and Federal ordinances, statutes, and regulations, including Federal drug laws. It is the Grantor's sole responsibility to identify and follow each regulation, at Grantor's sole expense.

  3. It is further agreed that the Protected Property is accurately depicted and described in both the Parent P&S Farm Conservation Plan and a Baseline Documentation Report ("BDR") signed by the original Grantor on or about the date of this Grant and held by Grantee VLT, on behalf of all

Grantees. Grantees may use the Parent P&S Farm Conservation Plan or BDR in enforcing this Grant, but are not limited in their use of the Parent P&S Farm Conservation Plan and BDR to show a change of conditions.

4.      Grantees shall transfer the development rights, option to purchase, and conservation easement and restrictions conveyed by Grantor herein only to a State agency, municipality, or qualified organization, as defined in Chapter 34 or Chapter 155 Title 10 V.S.A., in accordance with the laws of the State of Vermont and the regulations established by the Internal Revenue Service governing such transfers.

5.      Extinguishment, Termination and Condemnation.

a)      <u>Grant Requirements</u>.  This Grant constitutes a real property interest immediately vested in the Grantees.  This Grant may be extinguished or terminated in whole or in part only in accordance with the laws of the State of Vermont and, as applicable, the Internal Revenue Code, as amended, and the regulations promulgated thereunder. In addition, the interests and rights under this Grant may only be extinguished or terminated with the written approval of the Grantees and the United States. Due to the Federal interest in this Grant, the United States must review and approve any proposed extinguishment, termination, or condemnation action that may affect its Federal interest in the Protected Property.

With respect to a proposed extinguishment, termination, or condemnation action Grantees and the United States stipulate that the fair market value the Grant is fifty-seven and five tenths percent (57.5%), hereinafter the "Proportionate Share," of the fair market value of the land unencumbered by this Grant. The Proportionate Share has been determined at the time of conveyance of this Grant by dividing the fair market value of this Grant ($627,500.00) by the fair market value of the Property without this Grant ($1,091,500.00). The Proportionate Share will remain constant over time.

If this Grant is extinguished, terminated, or condemned, in whole or in part, then the Grantor must reimburse Grantees and the United States an amount equal to the Proportionate Share of the fair market value of the land unencumbered by this Grant. The fair market value will be determined at the time all or part of this Grant is terminated, extinguished, or condemned by an appraisal that meets the Uniform Standards of Professional Appraisal Practice (USPAP) or Uniform Acquisition Standards or Federal Land Acquisition (UASFLA). The appraisal must be completed by a certified general appraiser and be approved by the Grantee and the United States.

Unless otherwise provided in Subparagraph 5 (b) below, the allocation of the Proportionate Share between the Grantees and the United States must be as follows: (a) to the Grantees or their designee(s), fifty percent (50%) of the Proportionate Share; and, (b) to the United States fifty percent (50%) of the Proportionate Share.  Until such time as the Grantees and the United States receive the Proportionate Share from the Grantor or the Grantor's successor or assign, the Grantees and the United States each have a lien against the Protected Property for the amount of the Proportionate Share due each of them. The Grantees or their designee(s) must use their allocation of the Proportionate Share in a manner consistent with the conservation purposes of the Grant. If proceeds from termination, extinguishment, or condemnation are paid directly to Grantees, as required by Subparagraph 5(b) below, or to the United States, each party agrees to reimburse the other parties up to the amount of the allocation of Proportionate Share to which they are entitled, as set forth in this Subparagraph 5(a), unless the federal Treasury Regulations require otherwise.  If Grantees receive more than their Proportionate Share as set forth in this Subparagraph 5(a) because of the Treasury Regulation requirements of Subparagraph 5(b) below, Grantees must obtain the United States' written approval of their use of such additional funds to achieve conservation purposes that are consistent with the Purposes of this Grant.

b)      <u>For Purposes of a Federal Income Tax Deduction</u>.  As provided for in Section 1.170A-14(g)(6)(i) of the Treasury Regulations, if a subsequent unexpected change in the conditions surrounding the Protected Property arise in the future which makes impossible or impractical the continued use of the Protected Property for the conservation purposes set forth herein, this Grant may be terminated or extinguished, whether in whole or in part, by judicial proceedings in a court of competent jurisdiction. For the purposes of Grantor's claim of a federal income tax deduction under Internal Revenue Code Section 170(h) and associated Treasury Regulations, the fair market value of the Grant at the time of condemnation, termination or extinguishment shall be determined by multiplying (i) the fair market value of the Protected Property unencumbered by the Grant at the time of termination by (ii) the ratio of the value of the Grant at the time of this Grant to the value of the Protected Property without deduction for the value of the Grant at the time of the Grant.  The ratio referred to in the preceding sentence shall be established by a qualified appraisal for federal income, gift and estate tax deduction purposes, pursuant to Treasury Regulation §1.170A-13 and §1.170A-14(h), and the ratio shall remain constant.

Pursuant to Treasury Regulation 1.170A-14(g)(6)(ii), after termination of this Grant, in whole or in part, on a subsequent sale, exchange or involuntary conversion of the Protected Property, Grantees must be entitled to a portion of the proceeds that is at least equal to the proportionate value of the Grant as established by this Subparagraph 5(b). All of Grantees' proceeds, as determined above, must be used by the Grantees in a manner consistent with the conservation purposes of this Grant.

6. In any deed or lease conveying an interest in all or part of the Protected Property, Grantor shall make reference to the conservation easement, restrictions, and obligations described herein and shall indicate that said easement and restrictions are binding upon all successors in interest in the Protected Property in perpetuity. Grantor shall also notify Grantees of the name(s) and address(es) of Grantor's successor(s) in interest.

7. While title is herein conveyed to Grantees as tenants in common, the rights and interests described in this Grant, including enforcement of the conservation easement and restrictions, may be exercised by Grantees collectively, or by any single Grantee individually; provided, however, that court enforcement action by a single Grantee shall foreclose action on the same issue(s) by the other Grantees who shall be bound by the final determination.

8. The term "Grantor" includes the heirs, executors, administrators, successors, and assigns of the original Grantor Philip Parent and Suzanne Parent. The term "Grantees" includes the respective successors and assigns of the original Grantees, VLT and VHCB. The term "family" includes: (a) any spouse of Grantor and any persons related to Grantor by blood to the 4th degree of kinship or by adoption, together with spouses of family members, (b) a corporation, partnership or other entity which is wholly owned and controlled by Grantor or Grantor's family (as defined herein), (c) any estate of Grantor or Grantor's family, and (d) all owners of a Grantor corporation, partnership, trust or other entity who are related to each other by blood to the 4th degree of kinship or by adoption, together with spouses of family members.

9. Grantor shall pay all real estate taxes and assessments on the Protected Property and shall pay all other taxes, if any, assessed in lieu of or in substitution for real estate taxes on the Protected Property.

10. Grantor shall indemnify and hold harmless Grantees, their employees, agents, and assigns for any and all liabilities, claims, demands, losses, expenses, damages, fines, fees, penalties, suits, proceedings, actions, costs of actions, or sanctions asserted by or on behalf of any person or governmental authority, and other liabilities (whether legal or equitable in nature and including, without limitation, court costs, and reasonable attorneys' fees and attorneys' fees on appeal) to which Grantees may be subject or incur relating to the Protected Property, which may arise from, but are not limited to, Grantor's negligent acts or omissions or Grantor's breach of any representation, warranty, covenant, or agreements contained in this Grant, or violations of any Federal, State, or local laws, including all Environmental Laws (as defined below).

11. If any Grantee takes legal title to Grantor's interest in the Protected Property, the Grantee acquiring title shall commit the monitoring and enforcement of the Grant to another Grantee until the Grantee acquiring title conveys title to a successor Grantor.

12. This Grant is created pursuant to Chapter 34 of Title 10, Conservation and Preservation Rights and Interests (10 V.S.A. 821-823) and Chapter 155 of Title 10, Acquisition of Interests in Land by Public Agencies (10 V.S.A. 6301 – 6309), and this Grant shall be governed by and construed in accordance with the laws of the State of Vermont to effectuate the Purposes of the Grant. In the event that any provision or clause in this Grant conflicts with applicable law, such conflict shall not affect other provisions hereof which can be given effect without the conflicting provision. To this end the provisions of this Grant are declared to be severable.

13. Amendment. This Grant may be amended only if, in the sole and exclusive judgment of the Grantees and United States, by and through the Chief of NRCS, such amendment is consistent with the Purposes of this Grant and complies with all applicable laws and regulations. The Grantees must provide timely written notice to the Chief of NRCS of any proposed amendments. Prior to the signing and recordation of the amended Grant, such amendment(s) must be mutually agreed upon by the Grantees, Grantor, and United States, by and through the Chief of NRCS. Any purported amendment that is recorded without the prior approval of the United States is null and void. Notwithstanding the foregoing, Grantor and Grantees have no right or power to agree to any amendment that would limit the term of the Grant, or adversely affect the qualification of this Grant or the status of Grantees under applicable laws, including without limitation Title 10 V.S.A. Chapters 34 and 155, Section 170(h) and 501(c)(3) of the Internal Revenue Code, as amended, and regulations issued pursuant thereto.

INVALIDATION of any provision hereof shall not affect any other provision of this Grant.

TO HAVE AND TO HOLD said granted development rights, option to purchase, access easement and a perpetual conservation easement and restrictions, with all the privileges and appurtenances thereof, to the said Grantees, **VERMONT LAND TRUST, INC.**, and **VERMONT HOUSING AND CONSERVATION BOARD**, their respective successors and assigns, and the UNITED STATES and its assigns to the extent of its enforcement rights, to their own use and behoof forever, and the said Grantor, **PHILIP PARENT** and **SUZANNE PARENT** for themselves and their heirs, executors, administrators, and assigns, does covenant with the said Grantees and the UNITED STATES, their successors and assigns, that until the ensealing of these presents, Grantor is the sole owners of the premises, and Grantor has good right and title to convey the same in the manner aforesaid, that the premises are free from every encumbrance, except those of record, not intending hereby to reinstate any interest or right terminated or superseded by this Grant, operation of law, abandonment or 27 V.S.A. Ch. 5, Subch. 7; and Grantor hereby engages to warrant and defend the same against all lawful claims whatever, except as aforesaid.

We herein set our hands at St. Albans, Vermont this 16th day of December, 2021.

GRANTOR

_____
Philip Parent

_____
Suzanne Parent

STATE OF VERMONT
FRANKLIN COUNTY, ss.

At St. Albans, this 16th day of December, 2021, Philip Parent and Suzanne Parent personally appeared and they acknowledged this instrument, by them sealed and subscribed, to be their free act and deed, before me.

Before me, _____
Print Name - Stephen McDonald
Notary Public, State of Vermont
Credential #_____
My Commission Expires: January 31, 2023

**VERMONT LAND TRUST, INC. ACCEPTANCE**

The Vermont Land Trust, Inc. hereby acknowledges, approves, and accepts, the foregoing Grant and the rights and obligations conveyed therein.

__12/16/21__  By: _____
Date  Its Duly Authorized Agent

**STATE OF VERMONT**
**COUNTY OF** Washington , SS.

At Montpelier , Vermont on this 10th day of December, 2021, personally appeared Christine McShea, duly authorized agent of the **Vermont Land Trust, Inc.**, and she acknowledged this instrument, by her sealed and subscribed, to be her free act and deed and the free act and deed of the Vermont Land Trust, Inc., before me.

Before me, _____
Print Name - 
**Caitlin Belcher**
**Notary Public State of Vermont** Notary Public, State of Vermont
**Commission Expires:** 01/3/2023 Credential # _____
**Commission # 157.0005342** My Commission Expires: January 31, 2023

**VERMONT HOUSING AND CONSERVATION BOARD ACCEPTANCE**

The Vermont Housing and Conservation Board hereby acknowledges, approves, and accepts, the foregoing Grant and the rights and obligations conveyed therein.

__11/20/2021__  By: _____
Date  Its Duly Authorized Agent

**STATE OF VERMONT**
**COUNTY OF WASHINGTON, SS.**

At Montpelier, Vermont on this 20th day of November, 2021, personally appeared Lawrence W. Mires, duly authorized agent of the **Vermont Housing and Conservation Board**, and he acknowledged this instrument, by him sealed and subscribed, to be his free act and deed and the free act and deed of the Vermont Housing and Conservation Board, before me.

Before me, _____
Print Name - Elizabeth M. Egan
Notary Public, State of Vermont
Credential #157.0002746
My Commission Expires: January 31, 2023

## SCHEDULE A
## PROTECTED PROPERTY

Being all and the same lands and premises, with any and all structures and improvements that may be situated thereon, conveyed to Grantor by:

1. Warranty Deed of Ulys Parent and Helen Parent dated November 17, 1987 and recorded in Book 42, Page 222 of the Sheldon Land Records and Book 65, Page 604 of the Enosburg Land Records.
2. Warranty Deed Reginald P. Robytoy and Beverly N. Robtoy dated January 15, 1996 and recorded in Book 57, Page 376 of the Sheldon Land Records.
3. Warranty Deed of Latimer dated August 7, 2007 and recorded in Book 97, Page 346 of the Sheldon Land Records.
4. Warranty Deed of Messier dated April 22, 2008 and recorded in Book 100, Page 65 of the Sheldon Land Records.

Reference is made to an exchange of Quitclaim Deeds by and between Grantor and Stephen A. McDonald, Trustee to Reconvey, both dated November 23, 2021 and recorded in Book 140 Page 180 and Page 182 of the Sheldon Land Records.

**Not included in this description** is a parcel of land conveyed to Paul T. Godin and Holly M. Godin by Warranty Deed of Grantor dated November 14, 2014 and recorded in Book 120, Page 392 of the Sheldon Land Records.

**Excepted and excluded** from this description of the Protected Property are the following:
1. All land owned by Grantor located in Enosburgh, Vermont
2. A 3.88 acre parcel more particularly described on a survey entitled "Boundary Plat of Vermont Land Trust Exclusion Area on Lands Owned by Philip & Suzanne Parent, Northerly of Vermont Route 105, Town of Sheldon, County of Franklin, State of Vermont" by Kittredge Land Surveying, dated September 9, 2021 and recorded on or about even date herewith at Map Slide _____ of the Sheldon Land Records.

Meaning and intending to include in this description of the Protected Property all of the land with the buildings and improvements thereon lying on both sides of Vermont Route 105, in the Town of Sheldon, Vermont, except as excluded above, and generally described as containing 279 acres, more or less.

**Right of Access for Monitoring and Enforcement.** Grantor does freely give, grant, sell, convey and confirm onto Grantees, their successors and assigns, and the United States acting by and through the United States Department of Agricultural National Resource Conservation Services, forever, a perpetual and separately assignable, non-exclusive, easement; said easement being across the Sheldon Junction-Richford segment line of railroad, currently used as the Missisquoi Valley Rail Trail, depicted as "RR crossing" on the Parent P&S Farm Conservation Plan and being more particularly described as follows:

An easement sixteen (16) feet in width for limited pedestrian access on, over, under and across the farm crossing, said farm crossing being described in a Farm Crossing Agreement between the State of Vermont, Agency of Transportation and Philip Parent and Suzanne Parent dated on or about even date and recorded in the Sheldon Land Records. The farm crossing is located at or near the former Central Vermont RY. CO., valuation station 870+25.5 (milepost 16.482).

NOTICE: **Unless otherwise expressly indicated, the descriptions in this Schedule A and in any subsequent Schedules are not based on a survey or subdivision plat.** The Grantor and Grantees have used their best efforts to depict the approximate boundaries of the Protected Property and any excluded parcels, complexes or ecological protection zones on a plan entitled "**Vermont Land Trust** - Parent P&S Farm, Town of Sheldon, Franklin County, VT, December 2021" signed by the Grantor and VLT (referred to throughout this Grant and its Schedules as "Parent P&S Farm Conservation Plan"). The Parent P&S Farm Conservation Plan is based upon Vermont Base Map digital orthophotos and other information available to VLT at the time of the Plan's preparation. Any metes and bounds descriptions included in the Schedules herein are approximate only. They are computer generated and are not the result of field measurements or extensive title research. The Parent P&S Farm Conservation Plan and any metes and bounds descriptions herein are intended solely for the use of the Grantor and Grantees in establishing the approximate location of the areas described and for administering and interpreting the terms and conditions of this Grant. No monuments have been placed on the ground. The Parent P&S Farm Conservation Plan is kept by VLT in its Stewardship Office. **The Parent P&S Farm Conservation Plan is not a survey and**

**must not be used as a survey or for any conveyance or subdivision of the land depicted thereon.**

Grantor and Grantees do not intend to imply any limitation on the area of land included in this description, should a survey determine that additional land is also encumbered by the Grant. If, in the future, the Grantor or Grantees shall prepare a survey of the Protected Property, of any portion thereof, or of any excluded lands, and that survey is accepted by the other party or confirmed by a court, the descriptions in the survey shall control.

Reference may be made to the above-described deed and record, and to the deeds and records referred to therein, in further aid of this description.

===============================================
## SCHEDULE B
## FARMSTEAD COMPLEX

The "Farmstead Complexes" referred to in Section III(8) of this Grant are two areas containg 14.5 acres and 8.0 acres, more or less, and is more particularly described as follows, all bearings are referenced to "Grid North:"

1. South Complex- 14.5 aces located on the northerly side of Vermont Route 105.

Beginning at the southwest corner of land now or formerly of Godin on the northerly edge of the Vermont Route 105 right of way; thence proceeding
Westerly a distance of 980 feet, more or less, along the northerly edge of the Vermont Route 105 right of way to a point; thence turning and proceeding
North 00° East a distance of 575 feet, more or less, across the Protected Property to a point; thence turning and proceeding
North 90° East a distance of 1,502 feet, more or less, across the Protected Property to a point; thence turning and proceeding
South 07° 22' 24" East a distance of 61 feet, more or less, to the northwest corner of the 3.88 acre Excluded Parcel described in Schedule A; thence proceeding
South 07° 22' 24" East a distance of 178.20 feet, more or less along the westerly boundary of the 3.88 acre Excluded Parcel to the northeast corner of land now or formerly of Dulude; thence turning and proceeding
South 89° 55' West a distance of 559.99 feet, more or less, along the northerly boundary of Dulude and the northerly boundary of Godin to the northwest corner of Godin;
Thence turning and proceeding South 00° 28' East a distance of 259.38 feet, more or less, along the westerly boundary of Godin to the point of beginning.

2. The West Complex- 8.0 acres located on the easterly side of Colton Road road.

Beginning at a point on the easterly edge of the Colton Road right of way, said poing being northerly a distance of 595 feet, more or less, along said right of way from the northwest corner of land nor or formerly of Plouff; thence proceeding
Northerly a distance of 1,115 feet, more or less, along the easterly edge of the Colton Road right of way to a point; thence turning and proceeding
South 04° East a distance of 880 feet, more or less, across the Protected Property to a point; thence turning and proceeding
South 86° West a distance of 563 feet, more or less, across the Protected Property to the point of beginning.